# In the United States Court of Federal Claims

No. 24-1391T
Filed: August 25, 2026
FOR PUBLICATION

**THE SOUTH SASKATCHEWAN COMMUNITY FOUNDATION INC.,**

***Plaintiff,***

**v.**

**UNITED STATES,**

***Defendant.***

*Stuart Evan Horwich*, Horwich Law LLP, London, United Kingdom; *Max Reed*, Polaris Tax Counsel, Vancouver, Canada, for the plaintiff.

*Elizabeth Villarreal*, Tax Division, U.S. Department of Justice, Washington, DC, for the defendant.

**MEMORANDUM OPINION**

***HERTLING*, Judge**

The plaintiff, South Saskatchewan Community Foundation Inc. ("SSCF"), sues the United States, acting through the Internal Revenue Service ("IRS"), for a refund of $60,735.18 in U.S. federal income tax withheld from its U.S.-source dividend income for the tax years ending December 31, 2019, and December 31, 2020. SSCF is a Canadian charity; it does not pay taxes in Canada on the earnings from its invested assets.

SSCF contends it is entitled to a *pro rata* refund of its U.S. taxes under Article XXI(1) of the United States-Canada Convention with Respect to Taxes on Income and on Capital, Sept. 26, 1980, T.I.A.S. No. 11,087, as amended (the "Tax Treaty").[1] Article XXI(1) generally exempts qualifying charitable organizations, like SSCF, from tax in the other treaty country to the extent the income is exempt in their home country. The plaintiff argues that under Article IV(6) of the Tax Treaty, it derived income from holdings in the U.S. owned by the TD Greystone Global Equity Fund (the "Greystone Fund"), a Canadian unit trust, of which SSCF is a unitholder and

[1] As amended by the Protocols signed on June 14, 1983, T.I.A.S. No. 11,087 (Protocol 1); March 28, 1984, T.I.A.S. No. 11,087 (Protocol 2); March 17, 1995, T.I.A.S. No. 97-1216 (Protocol 3); July 29, 1997, T.I.A.S. No. 97-1216 (Protocol 4); and September 21, 2007, T.I.A.S. No. 08-1215.2 (Protocol 5).

beneficiary. Article IV(6) provides that income may be "derived" by a resident of a contracting state if the entity through which the resident derives the income is fiscally transparent. SSCF argues that the Greystone Fund is fiscally transparent under Canadian law and satisfies the definition of fiscally transparent under 26 C.F.R. § 1.894-1(d)(3)(iii) (the "Treasury Regulation").[2] SSCF concludes that under the Tax Treaty it may therefore claim Article XXI(1)'s exemption on its U.S.-derived income earned from the Greystone Fund.

The defendant rejects SSCF's argument, arguing that the Treasury Regulation is not relevant because the terms of the Tax Treaty itself control and foreclose SSCF's argument. The defendant argues that the United States and Canada did not intend for Article IV(6) to apply to charities at all, and if it does apply the provision does not cover unit trusts or the income they derive, even when the beneficiary is a charity. The defendant argues that Article XXI(3), which specifically addresses tax-exempt organizations investing through pooled investment vehicles, is the only avenue for SSCF to preserve its tax-exempt status. Thus, the defendant argues that the Treasury Regulation need not be considered at all because the Tax Treaty itself does not treat unit trusts like the Greystone Fund as fiscally transparent. Thus, even if the Greystone Fund is fiscally transparent under the Treasury Regulation it would not fall within Article IV(6).

To support its position, the defendant also relies on the Technical Explanation to the Fifth Protocol to the Tax Treaty (the "Technical Explanation") and the Tax Treaty's text and amendment history. The defendant contends that whether unit trusts are fiscally transparent or not, these sources show the shared understanding of both the United States and Canada that charities with holdings in unit trusts are unable to take advantage of Article IV(6)(b) in lieu of the express provision of Article XXI(3).

---

[2] The Treasury Regulation provides: "[A]n entity is treated as fiscally transparent under the law of an interest holder's jurisdiction with respect to an item of income to the extent that the laws of the interest holder's jurisdiction require the interest holder resident in that jurisdiction to separately take into account on a current basis the interest holder's respective share of the item of income paid to the entity, whether or not distributed to the interest holder, and the character and source of the item in the hands of the interest holder are determined as if such item were realized directly from the source from which realized by the entity. However, an entity will be fiscally transparent with respect to the item of income even if the item of income is not separately taken into account by the interest holder, provided the item of income, if separately taken into account by the interest holder, would not result in an income tax liability for that interest holder different from that which would result if the interest holder did not take the item into account separately, and provided the interest holder is required to take into account on a current basis the interest holder's share of all such nonseparately stated items of income paid to the entity, whether or not distributed to the interest holder. An entity will not be treated as fiscally transparent with respect to an item of income under the laws of the interest holder's jurisdiction, however, if, under the laws of the interest holder's jurisdiction, the interest holder in the entity is required to include in gross income a share of all or a part of the entity's income on a current basis year under any type of anti-deferral or comparable mechanism. In determining whether an entity is fiscally transparent with respect to an item of income under the laws of an interest holder's jurisdiction, it is irrelevant how the entity is treated under the laws of the entity's jurisdiction."

If the plaintiff were correct in its interpretation of the Tax Treaty, it would prevail as it meets the definition of fiscally transparent under the Treasury Regulation, because Canadian law requires it to include its share of the Greystone Fund's U.S.-source dividend income in its annual income on a current basis. Taken either separately or together, however, the Tax Treaty's text, structure, and amendment history, confirmed by the Technical Explanation and the summary of the Fifth Protocol prepared by the congressional Joint Committee on Taxation ("JCT") when considering the ratification of the Fifth Protocol, reflect that the signatories did not intend Article IV(6) to provide charities an alternative avenue to avoid taxation on income that does not qualify under Article XXI(3). Instead, through the adoption of Article XXI(3), the signatories intended that tax-exempt charitable organizations could obtain reciprocal tax treatment only by investing through pooled investments specified in that provision. In addition, the Technical Explanation reflects that unit trusts like the Greystone Fund do not satisfy Article IV(6). Accordingly, the defendant is entitled to summary judgment.

## I. FACTUAL BACKGROUND

SSCF is a not-for-profit corporation and registered charity organized under the laws of Saskatchewan, Canada. Under the tax laws of Canada, SSCF is exempt from Canadian income tax, including on dividend income. SSCF provides small donors with the ability to create endowments and donor-advised funds which SSCF then manages, invests, and distributes to charities in the southern part of Saskatchewan. As of December 31, 2020, SSCF's endowment was approximately CAD 90 million.

During the 2019 and 2020 tax years, SSCF invested a portion of its endowment in the Greystone Fund, a fund organized under the laws of Ontario as a "unit trust." A unit trust under Canadian law is a trust in which beneficiaries or unitholders own units, like shares in a fund, and those units can be redeemed with the trust. *See* Canadian Income Tax Act ("ITA") § 108(2). A unit trust generally must be based in Canada and invest mainly in stocks, bonds, cash, or Canadian real estate. *Id*. As an investor in the Greystone Fund, SSCF is a beneficiary of the Greystone Fund.[3]

The Greystone Fund is established and subject to the terms of the TD Greystone Pooled Funds Amended, Consolidated and Restated Trust Agreement (Post-2000) (the "Trust Agreement"). Article 6.1 of the Trust Agreement outlines the distribution policy of the Greystone Fund:

> Sufficient of the net income and sufficient of the net realized taxable capital gains of each Fund for each taxation year shall be payable before the end of such year to unitholders of the Fund who were unitholders during the year so that the Fund will not have any liability for income tax. The amount payable to each unitholder shall be determined by the Manager as at the valuation time on each Distribution Day and shall become payable as at that valuation time

[3] For the purposes of this opinion, beneficiary and interest holder are used interchangeably.

> to the unitholders who were unitholders at the record time on the immediately preceding valuation day. The amount payable to a unitholder of the Fund at that time shall be equal to the unitholder's proportionate share of the net income, if the Distribution Day is an Income Distribution Day, and the net realized taxable capital gains of the Fund, if the Distribution Day is a Capital Gains Distribution Day.

(ECF 19-21 at 29.)

According to the two Canadian tax forms issued by the Greystone Fund to SSCF, SSCF's share of the Greystone Fund's income was made payable in both 2019 and 2020 in accordance with Article 6.1. (ECF 19-12; ECF 19-13.)

The Greystone Fund is managed by Toronto Dominion Asset Management. (ECF 1 at ¶ 6.)[4] Unlike SSCF, the Greystone Fund is not a charity and is not tax-exempt under the laws of Canada. Among its holdings, the Greystone Fund owns U.S. equities. As the Greystone Fund is not a U.S. entity, when it earns dividend income on its U.S. equities, U.S. tax law requires a qualified intermediary to withhold taxes on that income and remit the withheld taxes to the IRS. In tax years 2019 and 2020, CIBC Mellon, the Greystone Fund's qualified intermediary, withheld and remitted to the IRS tax on all the Greystone Fund's U.S.-source dividend income, including dividends SSCF would have received. (*Id.* at ¶¶ 16, 22.)

For tax years 2019 and 2020, CIBC Mellon issued one or more Forms 1042-S indicating that it remitted to the IRS $21,967 in U.S. income-tax payments for 2019, and $64,511 for 2020. (*Id.*) According to the plaintiff, these payments reflect a withholding tax rate of 15% of the gross amount of U.S.-source income, received by the Greystone Fund. (*Id.*) The plaintiff also claims a withholding tax rate of 30% for certain other U.S.-source income. (*Id.* at ¶ 22.)

In September 2021, SSCF filed with the IRS a tax return as a foreign corporation (Form 1120-F) for the 2019 and 2020 tax years seeking a refund of its *pro rata* share of the income tax withheld by CIBC Mellon. (*Id.*) For 2019, the plaintiff estimated this amount to be $15,381.29. (*Id*. at ¶ 17.) For 2020, the plaintiff estimated its refund to be $45,353.89.[5] (*Id*. at ¶ 23.) The Forms 1120-F explained that under the terms of the Tax Treaty, the plaintiff, as a registered Canadian charity, is exempt from paying U.S. income tax. (*Id*. at ¶¶ 17, 23.) The Forms 1120-F also claimed that the Greystone Fund is a flow-through entity for purposes of U.S. and Canadian income tax. (*Id.*) As a result, the plaintiff was entitled to the tax exemption provided under the terms of the Tax Treaty. (*Id.*) The IRS neither refunded SSCF's withheld taxes nor issued a

---

[4] The recitation of the facts cites to the complaint because the defendant does not challenge SSCF's factual allegations.

[5] Although the complaint seeks $45,383.89, a $30.00 increase for the 2020 tax year, SSCF acknowledged at oral argument that this discrepancy was due to a typographical error.

notice of disallowance or any other correspondence denying either of the plaintiff's refund claims. (*Id.* at ¶¶ 18, 24.)

In 2021, 17 Canadian tax-exempt entities seeking refunds of U.S. income taxes invoked Article XXVI(1) of the Tax Treaty to initiate its Mutual Agreement Procedure ("MAP"). (*Id.* at ¶¶ 11-14.) The MAP requires the tax authorities of both countries to attempt to resolve treaty interpretation issues. SSCF filed its own MAP request on September 3, 2024. (*Id.* at ¶ 11.)

Canada and the United States have been unable to reach an agreement under the MAP process for any of the 18 pending MAP requests.[6] (ECF 9-4 at 1.) On December 18, 2024, the Canada Revenue Agency ("CRA") wrote to the plaintiff's counsel in response to the plaintiff's request for assistance under MAP. In the letter, the CRA opined that:

> The Taxpayers are resident in Canada and are registered charities and pensions plans for Canadian tax purposes. The Taxpayers' income is exempt from taxation in Canada under Article 149(1) of the Income Tax Act. The Taxpayers report the dividend income earned from their investments through Canadian mutual funds on their Canadian tax returns. The Taxpayers' income from dividends was subject to a 15% withholding tax in the United States. The Taxpayers requested a refund of this tax from the United States on the basis of Article XXI. The Canadian competent authority finds that the Taxpayers' position has merit and that they should receive the benefit available under Article XXI.

*Id.*

## II. PROCEDURAL HISTORY

On September 9, 2024, the plaintiff filed its complaint. During discovery, the defendant withheld from its production communications from the CRA to the IRS in support of the claims of the Canadian non-profits. On April 23, 2025, the plaintiff moved to compel the production of the CRA's communications with the IRS in connection with the MAP. (ECF 9.) The defendant opposed the motion. (ECF 10.) On July 15, 2025, at the conclusion of oral argument, the motion to compel was denied. (ECF 14.)

On April 3, 2026, SSCF moved for summary judgment. (ECF 19.) The defendant responded to the plaintiff's motion and filed a cross-motion for summary judgement on May 4, 2026. (ECF 20.) The plaintiff filed its reply and response (ECF 22) on June 4, 2026, and the defendant filed its reply (ECF 23) on July 2, 2026. Oral argument was held on July 28, 2026.

## III. JURISDICTION AND STANDARD OF REVIEW

The Court of Federal Claims has jurisdiction pursuant to 28 U.S.C. § 1491(a) and 26 U.S.C. ("I.R.C.") § 7422. *See Christensen v. United States*, 168 Fed. Cl. 263, 297 (2023)

---

[6] All 18 MAP requests are being held in abeyance pending the outcome of this litigation.

(26 U.S.C. § 7422(f)(1) "expressly provides an exception to the jurisdictional bar on treaty-based claims" in 28 U.S.C. § 1502), *appeal filed*, No. 2024-1284 (Fed. Cir. Dec. 22, 2023).

Under Rule 56 of the Rules of the Court of Federal Claims ("RCFC"), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" are inappropriate at the summary-judgment stage. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). An issue is "genuine" only if it "may reasonably be resolved in favor of either party," and a fact is "material" if it "might affect the outcome of the suit under the governing law." *Id*. at 248-50. The parties agree that there are no disputed issues of material fact, and that the case may be resolved through summary judgement. (*See* ECF 19-1; ECF 20.)

RCFC 44.1 provides that a court's interpretation of foreign law "must be treated as a ruling on a question of law." As the case can be resolved based solely on the interpretation of the Tax Treaty and associated legal documents and regulations, it may be properly resolved as a matter of law.

RCFC 44.1 also provides that "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." To the extent the legal dispute here turns on an interpretation of the language of the Tax Treaty, that language must be interpreted through typical analytical methods. As the Federal Circuit explained in *Xerox Corp. v. United States*, 41 F.3d 647, 652 (Fed. Cir. 1994), the provisions of a treaty are given their ordinary meaning in the context of the treaty and in the way that best fulfills the purposes of the treaty and the intent or expectations of the signatories.

While a foreign government's views of the meaning of its laws are entitled to respectful consideration, they are not controlling. *Animal Science Products, Inc. v. Hebei Welcome Pharmaceuticals Co.,* 585 U.S. 33, 39 (2018). Just as courts no longer defer to an agency's interpretation of U.S. law, *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), deference is not due to the interpretation by either a U.S. or Canadian agency of a Canadian law written in English. The meaning of both U.S. and Canadian laws, as well as that of the Tax Treaty, is susceptible to being construed, interpreted, and applied using traditional methods of statutory interpretation.

## IV. TREATY & TECHNICAL EXPLANATION TO THE FIFTH PROTOCOL

The Tax Treaty was initially ratified in 1942. The 1942 Treaty was amended in 1950, 1956, and 1966. In 1980, the Tax Treaty was entirely renegotiated and has subsequently been amended in 1983, 1994, 1997, and 2007. The provisions at issue here were added in 2007, as part of the Fifth Protocol to the Tax Treaty.

Every iteration of the Tax Treaty has provided reciprocal exemptions from income tax derived by each other's tax-exempt organizations, including taxes owed on interest and dividend income. Article XXI(1) of the current version of the Tax Treaty provides:

> Subject to the provisions of paragraph 4, income derived by a religious, scientific, literary, educational or charitable organization shall be exempt from tax in a Contracting State if it is resident in the other Contracting State but only to the extent that such income is exempt from tax in that other State.

(ECF 19-3 at 22.)

Article XXI(3) allows tax-exempt organizations to avoid taxation on income derived through a trust that is itself exempt from income taxation and operated solely to earn income for tax-exempt organizations:

> Subject to the provisions of paragraph 4, income referred to in Articles X (Dividends) and XI (Interest) derived by a trust, company, organization or other arrangement that is a resident of a Contracting State, generally exempt from income taxation in a taxable year in that State and operated exclusively to earn income for the benefit of one or more of the following:
>
> > (a) an organization referred to in paragraph 1; or
> >
> > (b) a trust, company, organization or other arrangement referred to in paragraph 2;
>
> shall be exempt from income taxation in that taxable year in the other Contracting State.

(*Id*. at 22-23.)

In addition to these sections specifically addressing tax-exempt organizations, SSCF relies on Article IV(6) of the Tax Treaty, which provides that income may be "derived" by a resident of a contracting state if the entity through which it derives its income is fiscally transparent. Article IV(6) specifically reads:

> An amount of income, profit or gain shall be considered to be derived by a person who is a resident of a Contracting State where:
>
> > (a) the person is considered under the taxation law of that State to have derived the amount through an entity (other than an entity that is a resident of the other Contracting State); and
> >
> > (b) by reason of the entity being treated as fiscally transparent under the laws of the first-mentioned State, the treatment of the amount under the taxation law of that State is the same as its treatment would be if that amount had been derived directly by that person.

(*Id*. at 5-6.)

Both parties agree that had SSCF invested directly in the same U.S. securities held by the Greystone Fund, it would have derived the income itself, and no U.S. tax would be owed on the income under Article XXI(1). Likewise, the parties agree that, under Article XXI(3), SSCF's U.S. income through the Greystone Fund would not be subject to tax had the Greystone Fund been exempt from income taxation and operated solely to earn income for tax-exempt organizations. Finally, both parties agree that the Greystone Fund does not satisfy the restriction of Article XXI(3) because its unitholders are not limited to tax-exempt organizations.

Articles IV(6) and XXI(3) were both adopted through the Fifth Protocol to the Tax Treaty. In conjunction with the amendments to the Tax Treaty made by the Fifth Protocol, the United States prepared a Technical Explanation. The Technical Explanation is "an official United States guide to the [Fifth] Protocol[,]" which "[t]he Government of Canada has reviewed . . . and subscribe[d] to its contents." (ECF 19-8 at 2.) The Technical Explanation "accurately reflects the policies behind particular Protocol provisions, as well as understandings reached with respect to the application and interpretation of the protocol and the Convention." (*Id*.) Thus, the Technical Explanation provides the U.S. government's formal interpretation of Articles IV(6) and XXI(3), which the Canadian government endorsed.

Regarding Article IV(6), the Technical Explanation notes that:

> New paragraphs 6 and 7 are added to Article IV to provide specific rules for the treatment of amounts of income, profit or gain derived through or paid by fiscally transparent entities such as partnerships and certain trusts. Fiscally transparent entities, as explained more fully below, are in general entities the income of which is taxed at the beneficiary, member, or participant level. Entities that are subject to tax, but with respect to which tax may be relieved under an integrated system, are not considered fiscally transparent entities. Entities that are fiscally transparent for U.S. tax purposes include partnerships, common investment trusts under section 584, grantor trusts, and business entities such as a limited liability company ("LLC") that is treated as a partnership or is disregarded as an entity separate from its owner for U.S. tax purposes. Entities falling within this description in Canada are (except to the extent the law provides otherwise) partnerships and what are known as "bare" trusts.

(ECF 19-8 at 4.)

Regarding Article XXI(3), the Technical Explanation notes that:

> New paragraph 3 replaces and expands the scope of former subparagraph 2(b)[.] Former subparagraph 2(b) provided that, subject to the provisions of paragraph 3 (new paragraph 4), a trust, company, organization or other arrangement that was a resident of a Contracting State, generally exempt from income taxation in that

> State and operated exclusively to earn income for the benefit of one or more organizations described in subparagraph 2(a) (new paragraph 2) was exempt from taxation on dividend and interest income arising in the other Contracting State in a taxable year. The Internal Revenue Service concluded in private letter rulings (PLR 200111027 and PLR 200111037) that a pooled[-]investment fund that included as investors one or more organizations described in paragraph 1 could not qualify for benefits under former subparagraph 2(b). New paragraph 3 now allows organizations described in paragraph 1 to invest in pooled funds with trusts, companies, organizations, or other arrangements described in new paragraph 2.

(*Id*. at 41.)

In connection with the Senate's consideration and ratification of the Fifth Protocol in 2007, the JCT prepared a report outlining the Senate's understanding of the provisions at the center of SSCF's claim. The JCT is a bicameral, bipartisan committee that assists in evaluating tax treaties during Senate consideration of their ratification. Although not prepared by either of the direct parties to the negotiation, the report reflects the contemporaneous understanding of the Senate that ratified the Fifth Protocol.

The JCT provided an explanation of the purpose of Article XXI(3):

> Under the present treaty, certain types of exempt organizations (for example, pensions) may invest either directly or indirectly with other organizations of the same type, while other types of exempt organizations (for example, charities) are limited to direct investments. Thus, charitable type organizations–which are limited to direct investments–cannot participate in collective investment vehicles. This has the corresponding impact of prohibiting charitable-type organizations from pooling their investments with pensions that are investing indirectly through collective investment vehicles. New paragraph 3 eliminates this restriction by permitting charitable-type organizations to pool their investments with other exempt organizations. Thus, once the proposed protocol enters into force, charitable type organizations will be able to invest indirectly; this will have the corresponding impact of permitting them to pool their investments with pension-type organizations that are also investing indirectly.

(ECF 19-5 at 76.)

The JCT also provided an explanation of the purpose of Article IV(6):

> Paragraph 2 of Article 2 of the proposed protocol adds paragraphs 6 and 7 to Article IV of the treaty. These new paragraphs provide

> specific rules for the treatment of amounts of income, profit, or gain derived through or paid by fiscally transparent entities. As explained more fully below, fiscally transparent entities are entities the income of which is taxed at the beneficiary, member, or participant level. Entities that are subject to tax, but with respect to which tax may be relieved under an integrated system, are not considered fiscally transparent entities. Entities that are fiscally transparent for U.S. tax purposes include partnerships, common investment trusts under section 584, grantor trusts, and business entities such as a limited liability company ("LLC") that is treated as a partnership or is disregarded as an entity separate from its owner for U.S. tax purposes, including those entities that may elect such status.[ ] According to the Technical Explanation, entities falling within this description in Canada are (except to the extent the law provides otherwise) partnerships and what are known as "bare" trusts. These new paragraphs are relevant to a number of articles of the treaty, including Article V (Permanent Establishment), Article VII (Business Profits), [ ], Article X (Dividends), Article XI (Interest), and Article XII (Royalties).

(*Id*. at 41-42.)

## V. THE PLAINTIFF'S ARGUMENT

SSCF argues it is entitled to a *pro rata* refund of the U.S. tax on the Greystone Fund's U.S.-source dividend income. SSCF contends that it qualifies for a tax exemption under Article XXI(1) because the Greystone Fund is fiscally transparent under Canadian law, and therefore, under Article IV(6), SSCF derived its U.S.-source dividend income directly.

The parties do not dispute that Article IV(6)(a) is satisfied because SSCF derived the income through the Greystone Fund, a Canadian entity. The parties dispute whether the Greystone Fund is fiscally transparent under Canadian law as required to satisfy Article IV(6)(b).

Although Article IV(6)(b) of the Tax Treaty does not define what entities are fiscally transparent, the parties agree that, under Article III(2) of the Tax Treaty, undefined terms are defined pursuant to U.S. law when U.S. tax is at issue. Thus, the parties agree that for the purposes of Article IV(6)(b), the Treasury Regulation provides the relevant definition of fiscally transparent. [7]

---

[7] As discussed below, the defendant disputes that Article IV(6) applies here.

The Treasury Regulation defines a fiscally transparent entity as an entity that satisfies the "income inclusion rule" and either the "character and source rule" or the "same treatment rule."[8]

The "income inclusion rule" of the Treasury Regulation provides:

> [A]n entity is treated as fiscally transparent under the law of an interest holder's jurisdiction with respect to an item of income to the extent that the laws of the interest holder's jurisdiction require the interest holder resident in that jurisdiction to separately take into account on a current basis the interest holder's respective share of the item of income paid to the entity, whether or not distributed to the interest holder, and . . .

The Treasury Regulation goes on to restate the "income inclusion rule," further providing:

> . . . and provided the interest holder is required to take into account on a current basis the interest holder's share of all such nonseparately stated items of income paid to the entity, whether or not distributed to the interest holder.

The "character and source rule" of the Treasury Regulation provides:

> [T]he character and source of the item in the hands of the interest holder are determined as if such item were realized directly from the source from which realized by the entity.

The "same treatment rule" of the Treasury Regulation provides:

> However, an entity will be fiscally transparent with respect to the item of income even if the item of income is not separately taken into account by the interest holder, provided the item of income, if separately taken into account by the interest holder, would not result in an income tax liability for that interest holder different from that which would result if the interest holder did not take the item into account separately, . . .

To meet the definition of "fiscally transparent" under the Treasury Regulation, SSCF must satisfy the "income inclusion rule" and either the "character and source rule" or the "same treatment rule." The defendant concedes that SSCF would satisfy the "same treatment rule"

[8] The parties refer to the Treasury Regulation's first clause as the "income inclusion rule," the second as the "character and source rule," and the third as the "same treatment rule." The parties' labels for the requirements set out in the clauses of the Treasury Regulation are adopted herein.

because of its tax-exempt status in Canada, leaving the parties to dispute whether SCF meets the "income inclusion rule."

The plaintiff argues that SSCF satisfies the "income inclusion rule" for its U.S.-source dividend income because Canadian law requires SSCF to include its share of the Greystone Fund's U.S.-source dividends in its income for tax purposes, whether the Greystone Fund distributes the income to SSCF or not. The plaintiff argues that sections 104(13) and 104(24)(a) of the ITA require income paid or made payable to a trust beneficiary be accounted for in the year in which it was paid or made payable.

ITA § 104(13) provides:

> There shall be included in computing the income for a particular taxation year of a beneficiary under a trust such of the following amounts as are applicable:
>
> (a) in the case of a trust (other than a trust referred to in paragraph (a) of the definition *trust* in subsection 108(1)), such part of the amount that, but for subsections (6) and (12), would be the trust's income for the trust's taxation year that ended in the particular year as became payable in the trust's year to the beneficiary; and
>
> (b) in the case of a trust governed by an employee benefit plan to which the beneficiary has contributed as an employer, such part of the amount that, but for subsections (6) and (12), would be the trust's income for the trust's taxation year that ended in the particular year as was paid in the trust's year to the beneficiary.

According to SSCF, this provision requires it to include in its income its share of the portion of the Greystone Fund's income that "became payable" to it in the year it was paid or was made payable. The plaintiff then cites ITA § 104(24), which defines "payable" income as:

> For the purposes of subsections (6), (7), (7.01), (13), (16) and (20), subparagraph 53(2)(h)(i.1) and subsections 94(5.2) and (8), an amount is deemed not to have become payable to a beneficiary in a taxation year unless it was paid in the year to the beneficiary or the beneficiary was entitled in the year to enforce payment of it.

This section is written in the negative. Under ITA § 104(13), income is not payable unless it is paid to a beneficiary or a beneficiary is entitled to enforce payment of it; thus, income is payable if either it is paid in the year to a beneficiary or the beneficiary is entitled to enforce payment of the income.

The plaintiff contends that SSCF's U.S.-source dividend income from the Greystone Fund satisfies the definition of "payable" under ITA § 104(24). Under the Greystone Fund's Trust Agreement, the trustee is required each year to pay enough of the Greystone Fund's income and taxable investment gains to its unitholders before year-end so that the Greystone Fund itself does not have to pay income tax. (ECF 19-21 at 29.) Thus, because the Greystone

Fund's Trust Agreement obliges the trustee to make income "payable" to unitholders, SSCF acquires, no later than year-end, a legal right every year to enforce payment of its share of the trust's income, including U.S.-source dividends. The plaintiff argues that that right is grounded both in the terms of the Trust Agreement and in the trustee's statutory obligation under Ontario's Trustee Act to administer the trust in accordance with the trust instrument.

The plaintiff continues that under ITA § 104(13)(a), SSCF must include in its income for each year the portion of the Greystone Trust's income that "became payable" to it during that year. Because the Trust Agreement requires the Greystone Fund to make its net income and net realized taxable capital gains either paid or payable to unitholders to avoid entity-level tax, SSCF must take its share of the U.S.-source dividend income into account whether those funds are distributed to unitholders or not. In other words, the amounts are included in SSCF's income once they are paid or at the end of each year, when SSCF has the enforceable legal right to their payment; their inclusion in SSCF's income does not depend on their actual distribution. The Trust Agreement thus confers on SSCF, as a unitholder, a present legal right to compel payment of its income allocation.

Under Canadian law, this present enforceable right causes the income to be "payable" within the meaning of ITA § 104(24) and therefore included in SSCF's income under ITA § 104(13)(a), on a current-year basis, even if the funds are retained by the Greystone Fund. Consequently, on the plaintiff's analysis, Canadian law requires SSCF to include in its income the full amount of the Greystone Fund's U.S.-source dividends that are paid or payable to it, regardless of whether those amounts are distributed in cash or not, thereby satisfying the Treasury Regulation's "income inclusion rule." Because the defendant does not dispute the application of the other requirements of the Treasury Regulation, SSCF posits it must prevail.

## VI. THE DEFENDANT'S ARGUMENT

The defendant argues that the Treasury Regulation need not be considered because the Tax Treaty itself resolves the issue. The defendant posits that Article IV(6) does not treat unit trusts as fiscally transparent. Thus, the issue of whether the Greystone Fund might qualify as fiscally transparent under the Treasury Regulation is irrelevant to the question of whether SSCF is liable for U.S. taxes on its U.S.-source dividend income.

According to the defendant, Article IV(6)(b), on which SSCF's case turns, does not apply to unit trusts like the Greystone Fund. Thus, SSCF cannot be treated as having derived the Greystone Fund's U.S.-source dividend income through the Greystone Fund. Consequently, SSCF would not qualify for the exemption conferred on charitable institutions by Article XXI(1) with respect to that income.

To support its interpretation of the Tax Treaty, the defendant relies on the Tax Treaty's plain text, the historical development of that text, and the Technical Explanation, to which Canada also subscribed. The defendant contends that these sources show a shared understanding of the United States and Canada that Article IV(6)(b) does not apply to the use of pooled-investment vehicles by charitable organizations.

According to the defendant, Article XXI(3) specifically expanded the Tax Treaty's protection for qualifying exempt organizations that invest indirectly through pooled-investment vehicles. The defendant argues that Article XXI(3), rather than Article IV(6), is the provision the signatories designed to govern an exempt organization's investment through a pooled-investment vehicle. The defendant reads the addition of Article XXI(3) to the Tax Treaty as evidence of the signatories' intent. According to the defendant, if SSCF may invoke Article IV(6) because the Greystone Fund distributes or is liable to distribute its income to unitholders, charities would be able to bypass the limitations the signatories included in Article XXI(3).

The defendant also contends that the Greystone Fund falls outside the Technical Explanation's definition of a fiscally transparent entity, so even if Article IV(6) were applicable, it would not cover SSCF's income at issue. First, the defendant argues that the unit trust is itself a taxpayer, so its potential entity-level tax liability may be reduced or eliminated through the Canadian integrated tax system. Second, the defendant points to the specific list of Canadian entities identified in the Technical Explanation as fiscally transparent, and notes that unit trusts are not included.

The defendant argues that the Technical Explanation's text in identifying fiscally transparent entities is dispositive. For U.S. purposes, the Technical Explanation uses the word "include" in listing entities that are fiscally transparent. For identifying the corresponding Canadian entities defined as fiscally transparent, the Technical Explanation uses the word "are." The word "include" makes the U.S. list illustrative rather than exhaustive. By contrast, in identifying that the qualifying Canadian fiscally transparent entities "are" partnerships and bare trusts reflects that these are the only entities that meet the definition. Because Canadian unit trusts are not identified as one of the qualifying Canadian entities, the defendant contends that they fall outside Article IV(6)'s definition of fiscal transparency.

Alternatively, the defendant argues that, even if a court were to look beyond the treaty text and apply the Treasury Regulation's definition of fiscal transparency, SSCF cannot satisfy that regulation's income-inclusion rule. The defendant's central contention is that Canadian law does not require a unitholder in a Canadian unit trust to include its share of income received by the trust, "whether or not distributed" to that unitholder.

The defendant characterizes the unit trust's ability either to distribute or to make payable its income as optional rather than compulsory, so a unit trust is not always a transparent, pass-through entity, like a U.S. or Canadian partnership. The defendant relies on ITA § 104(6), governing a trust's deduction for income that becomes payable to beneficiaries, which provides that "there may be deducted in computing the income of a trust for a taxation year" amounts made payable to beneficiaries; in the ordinary case, the deductible amount is "the amount that the trust claims" up to the portion of its income that became payable to, or was included in the income of, a beneficiary. According to the defendant, the permissive language, "may be deducted" and "the amount that the trust claims" demonstrates that the statute does not compel a unit trust either to distribute or make payable all its income each year.

Moreover, the defendant argues that a beneficiary must include trust income only to the extent that income "became payable" to that beneficiary during the trust's taxation year.

ITA § 104(13)(a) provides that there "shall be included" in a beneficiary's income the portion of the trust's income "as became payable in the trust's year to the beneficiary." Thus, any income which does not become payable to SSCF is not required to be included in SSCF's current income.

The defendant argues that SSCF is required by Canadian law to include in its income only the portion of income that becomes payable to it, not its share of all dividends received by the Greystone Fund, regardless of whether those dividends are distributed or only made payable. This requirement is insufficient to meet the Treasury Regulation's requirement that the interest holder be taxed currently on its share of the entity's income. 26 CFR § 1.894-1(d)(3)(iii).

The defendant also argues that the Trust Agreement is a private governing instrument rather than Canadian law. The defendant posits that the Treasury Regulation asks whether the laws of the interest holder's jurisdiction require current inclusion of the income. *Id*. The defendant therefore maintains that a contractual or equitable entitlement created under a trust agreement cannot establish that Canadian law requires all unit-trust beneficiaries to include all trust income on a current basis. Moreover, the defendant argues that the Trust Agreement is itself flexible and grants the Greystone Trust's manager considerable discretion to alter the Trust Agreement. In the defendant's view, this confirms that the agreement operates as a mechanism by which the Greystone Fund may distribute income and reduce its own tax liability, not as a legal requirement that automatically attributes all income to beneficiaries as it is earned.

Finally, the defendant argues that the plaintiff cannot satisfy the Treasury Regulation's requirement that SSCF be required to take the Fund's income into account "whether or not distributed" merely by showing that the income was made payable under the Greystone Fund's Trust Agreement. The defendant argues that an amount which SSCF has a present legal right to demand is, in substance, a distribution or constructive distribution, not income retained by the Fund without any beneficiary entitlement. *See* 26 CFR § 1.301-1(b)–(c) (addressing the timing and treatment of corporate distributions). Therefore, the defendant contends, an amount that becomes payable under the Trust Agreement cannot establish the separate proposition required by the "income inclusion rule": that SSCF must take into account on a current basis its share of income that remains in the trust and is neither paid nor made payable to SSCF.

## VII. DISCUSSION

Article XXI(1) expressly provides that "income derived by a religious, scientific, literary, educational or charitable organization shall be exempt from tax." (ECF 19-3 at 21.) Article XXI(3), in turn, allows tax-exempt organizations to avoid taxation on income derived through a trust, company, or organization that is itself exempt from income taxation and operated solely to earn income for tax-exempt organizations. (*Id*. at 21-22.) Because the Greystone Fund is neither tax exempt nor operated solely to earn income for tax-exempt organizations, the income SSCF earns from the Greystone Fund does not satisfy the requirements of Article XXI(3).

The parties dispute whether the Greystone Fund may invoke the Tax Treaty's general tax-exempt provision, Article XXI(1) based on Article IV(6)'s general definition that tax-exempt income may be "derived" by a resident of a contracting state if the entity through which the

resident derives the income is fiscally transparent. The dispositive question, therefore, is whether Article IV(6) provides tax-exempt organizations with an alternative route to the benefits conferred on such organizations by Article XXI(1) when they invest through a trust that does not meet the requirements of Article XXI(3).

If the Greystone Fund satisfies Article IV(6)'s definition of a fiscally transparent entity, and the Treasury Regulation is applied to resolve its claim, SSCF would prevail because Canadian law requires SSCF to take its share of the Greystone Fund's U.S.-source dividend income into account on a current basis.

SSCF need not establish that every Canadian unit trust is fiscally transparent as to every item of income. It need only establish that, under Canadian law, it was required to take its allocable share of the Greystone Fund's U.S.-source dividends into account on a current basis, whether those dividends were "distributed" or not.

Under ITA § 104(13)(a), a trust beneficiary is required to include in its income the portion of the trust's income for the year that became "payable" to the beneficiary in that year. ITA § 104(24) defines income as "payable" when either the income is paid to the beneficiary during the year, or the beneficiary is legally entitled to enforce payment that year.

The Trust Agreement requires that the trustee make the Greystone Trust's annual income "payable" to unitholders each year. SSCF thus acquires the legal right to enforce payment of its share of the trust's income. This right comes not just from the terms of the Trust Agreement but also from the trust's statutory obligation under Ontario's Trustee Act to administer the trust in accordance with the trust instrument.[9] *See Trustee Act*, Rev. Stat. Ont. 1990, c. T.23.

Because the U.S.-source dividend income becomes payable to the Greystone Fund's unitholders each tax year, ITA § 104(13)(a) requires SSCF to include its share of the dividend income in its total income for that year. Additionally, because the Trust Agreement requires the Greystone Fund to make its net income and net realized taxable capital gains either paid or payable to unitholders to avoid entity-level tax, SSCF must take its share of the U.S.-source dividend income into account, even if those funds are not distributed to unitholders. The amounts are included in SSCF's income automatically, either because they are paid or because SSCF has the enforceable legal right to their payment.

The defendant relies on 26 C.F.R. § 1.301-1(c) to argue that SSCF's enforceable right to payment is itself a "distribution." Under that provision, a corporate distribution is included in a shareholder's gross income when cash or other property is "unqualifiedly made subject to [the shareholder's] demands." The defendant reasons that because SSCF could enforce payment of income made payable under the Trust Agreement, the income was necessarily distributed to SSCF. On that view, SSCF has not shown that Canadian law requires it to account for the dividends when they are not distributed; it has shown only that it accounts for them after they have been distributed, either actually or constructively.

[9] The parties do not dispute that Ontario provincial law applies to the Greystone Trust.

SSCF responds that 26 C.F.R. § 1.301-1(c) does not control. That regulation addresses the timing of income inclusion for distributions of money or property by a corporation to its shareholders under 26 U.S.C. § 301. SSCF argues that law does not define the term "distributed" for purposes of the separate fiscal-transparency rule in the Treasury Regulation. Moreover, 26 U.S.C. § 301(b) measures corporate distributions by the money or property the shareholder receives.

The Treasury Regulation is best read to give the phrase "whether or not distributed to the interest holder" its ordinary meaning. Thus, the relevant inquiry is not whether SSCF has an enforceable right to demand payment, but whether Canadian law requires SSCF to include its allocable share of the U.S.-source dividends in its income, even if the funds remain held by the Greystone Trust. The Trust Agreement makes the Greystone Trust's income "payable," and Canadian law requires SSCF to include in its income for each taxation year all "payable" income on a current basis. Thus, SSCF satisfies the income-inclusion rule.

Canadian law requires SSCF, in computing its income for each taxation year, to include its share of the Greystone Fund's U.S.-source dividend income currently, satisfying the "income inclusion rule," and the parties agree that SSCF's Canadian tax-exempt status satisfies the "same treatment rule." Therefore, unless the Tax Treaty itself forecloses SSCF's claim, SSCF will prevail, because SSCF meets the Treasury Regulation's requirements.

The Treasury Regulation is not decisive, however, because the Tax Treaty itself and the extrinsic evidence surrounding its adoption demonstrate that the signatories intended for Article XXI(3) to be the exclusive provision governing charitable investments made indirectly through pooled funds. Therefore, because the Greystone Fund does not satisfy the requirements of Article XXI(3), and Article IV(6) is inapplicable to unit trusts like the Greystone Fund, SSCF's claim is rejected.

### A. Principles of Treaty Interpretation

The interpretation of a treaty, like the interpretation of a statute or contract, begins with a treaty's text and structure. *Golan v. Saada,* 596 U.S. 666, 676 (2022); *Water Splash*, *Inc. v. Menon*, 581 U.S. 271, 276 (2017); *cf. Hunt Const. Grp., Inc. v. United States*, 281 F.3d 1369, 1372 (Fed. Cir. 2002) (a "contract must be considered as a whole and interpreted to effectuate its spirit and purpose, giving reasonable meaning to all parts.").

"[W]hen a treaty provision is ambiguous," courts "may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties." *Water Splash*, 581 U.S. at 280 (quoting *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 700 (1988)). "The 'opinions of our sister signatories,' . . . are 'entitled to considerable weight.'" *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 176 (1999) (quoting *Air France v. Saks*, 470 U.S. 392, 404 (1985)). Thus, "[t]he practice of treaty signatories counts as evidence of the treaty's proper interpretation, since their conduct generally evinces their understanding of the agreement they signed." *United States v. Stuart*, 489 U.S. 353, 369 (1989).

The Federal Circuit has articulated the Supreme Court's treaty-interpretation principles as follows:

> In construing a treaty, the terms thereof are given their ordinary meaning in the context of the treaty and are interpreted, in accordance with that meaning, in the way that best fulfills the purposes of the treaty. *See United States v. Stuart*, 489 U.S. 353, 365-66 (1989) (interpreting a treaty to carry out the intent or expectations of the signatories); *Kolovrat v. Oregon*, 366 U.S. 187, 193-94 (1961) (a treaty should be interpreted to carry out its purpose). As discussed in *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 185 (1981), the court's role is "limited to giving effect to the intent of the Treaty parties." *See generally* Restatement (Third) of Foreign Relations Law of the United States, Part III, Introductory Note at 144-145 (1987). The judicial obligation is to satisfy the intention of both of the signatory parties, in construing the terms of a treaty. *Valentine v. United States*, 299 U.S. 5, 11 (1936) ("it is our duty to interpret [the treaty] according to its terms. These must be fairly construed, but we cannot add or detract from them.")
>
> Unless the treaty terms are unclear on their face, or unclear as applied to the situation that has arisen, it should rarely be necessary to rely on extrinsic evidence in order to construe a treaty, for it is rarely possible to reconstruct all of the considerations and compromises that led the signatories to the final document. However, extrinsic material is often helpful in understanding the treaty and its purposes, thus providing an enlightened framework for reviewing its terms. *See Air France v. Saks*, 470 U.S. 392, 400 (1985) ("In interpreting a treaty it is proper, of course, to refer to the records of its drafting and negotiation.") However, "the ultimate question remains what was intended when the language actually employed . . . was chosen, imperfect as that language may be." *Great-West Life Assurance Co. v. United States*, 230 Ct. Cl. 477, 678 F.2d 180, 188 (Ct. Cl. 1982).

*Xerox Corp. v. United States*, 41 F.3d 647, 652-53 (Fed. Cir. 1994), *cert. denied*, 516 U.S. 817 (1995).

When considering a treaty's purpose and the intent of the parties to the treaty, the Supreme Court has considered items of extrinsic evidence "as 'aids to its interpretation' the negotiation and drafting history of the treaty as well as 'the postratification understanding' of signatory nations." *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 590 U.S. 432, 441 (2020) (quoting *Medellin v. Texas*, 552 U.S. 491, 507 (2008) (quoting *Zicherman v. Korean Air Lines Co.*, 516 U.S. 217, 226 (1996))).

Among the sources of extrinsic evidence that may aid in interpreting a treaty are the technical explanations of tax treaties prepared by the Treasury Department. Deference is not generally given to the Treasury Department's interpretation of a treaty expressed in its technical explanation because it does not typically reflect the views of the other contracting nation. *Christensen*, 168 Fed. Cl. at 307. The Federal Circuit has instructed that agency interpretations of treaties are entitled to "less deference" when the "'agency and a foreign country disagree on the meaning of a treaty.'" *Nat'l Westminster Bank, PLC v. United States*, 512 F.3d 1347, 1358 (Fed. Cir. 2008) (quoting *Iceland S.S. Co., Eimskip v. U.S. Dep't of the Army*, 201 F.3d 451, 458 (D.C. Cir. 2000).

While the Technical Explanation cannot supplant the language of the treaty if the two documents are in tension, it serves as extrinsic evidence of the signatories' contemporaneous understanding of the provisions of the Tax Treaty. The Technical Explanation is especially probative here because it is not merely a U.S. interpretation of the Tax Treaty. Rather, it is "an official United States guide to the [Fifth] Protocol[]" that "[t]he Government of Canada has reviewed . . . and subscribe[d] to its contents." (ECF 19-8 at 2.) The Technical Explanation notes of itself that it "accurately reflects the policies behind particular Protocol provisions, as well as understanding reached with respect to the application and interpretation of the protocol and the Convention." (*Id.*) Because Article IV(6) and Article XXI(3) were both added to the Tax Treaty through the Fifth Protocol, the Technical Explanation's summary of the purpose and effect of these provisions is directly relevant and highly probative to discerning the signatories' shared understanding of the purpose, scope, and intended interaction of the two provisions. *GE Energy Power*, 590 U.S. at 441.

Since this case has arisen, however, Canada has supported SSCF's position, so the two signatories disagree over the application of the Tax Treaty to these facts. Canada's support for SSCF here does not affect the interpretation of the provisions of the Fifth Protocol that Canada endorsed at the time the Fifth Protocol was negotiated and accepted by both parties. In this case, the Technical Explanation is entitled to "considerable weight" because it was accepted by Canada as an accurate reflection of the meaning of the provisions of the Fifth Protocol. *See El Al Israel Airlines*, 525 U.S. at 176.

Another source of extrinsic evidence is the JCT explanation. One of the JCT's roles is to prepare explanations of tax treaties that the Senate is considering for ratification. The JCT prepared such an explanation in connection with Senate consideration of the Fifth Protocol. JCT explanations have been used as extrinsic evidence to interpret tax treaties. In *Bruyea v. United States,* 174 Fed. Cl. 238, 257-58 (2024), *appeal filed*, No. 2025-1563 (Fed. Cir. March 20, 2025), Judge Solomson relied on a JCT explanation as extrinsic evidence to interpret a different provision of the Tax Treaty. The Senate has no role in negotiating tax treaties, but it must ratify them. Thus, like Treasury Department technical explanations, JCT explanations are not dispositive but can provide useful extrinsic evidence of the views of a coequal branch of government on the meaning of a treaty. The JCT explanation may be especially probative when, as here, it points in the same direction as the treaty language and the Treasury Department technical explanation, when the latter is subscribed to by the other signatory to the treaty.

**B. Tax Treaty**

A harmonious reading of the whole Tax Treaty, giving each provision effect, precludes SSCF from invoking Article IV(6) to claim tax-exempt treatment for income derived through pooled investments. SSCF relies on an article of general application (Article IV(6)) that applies to the treatment of income from entities, including trusts; the defendant relies on an article specific to charitable organizations like the plaintiff (Article XXI(3)). Article IV(6) potentially encompasses a broad class of fiscally transparent entities, while Article XXI(3) addresses the narrower and closely analogous circumstance of charitable organizations investing through pooled-investment vehicles. Nothing in Article IV(6) limits its terms to apply to any type of entity, including one covered by Article XXI(3), and nothing in Article XXI(3) forecloses charitable entities from seeking to invoke the principles of Article IV(6).

On their own terms, the two provisions should, if practicable, be read harmoniously. *See Geofroy* v. *Riggs*, 133 U.S. 258, 270 (1890) ("It is a rule, in construing treaties as well as laws, to give a sensible meaning to all their provisions if that be practicable."). Moreover, it is a standard rule of construction that a specific provision controls over a more general one. "[A] specific statute controls over a general one 'without regard to priority of enactment.'" *Bulova Watch Co. v. United States*, 365 U.S. 753, 758 (1961) (quoting *Townsend v. Little*, 109 U.S. 504, 512 (1883)); *see D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204 (1932) ("Specific terms prevail over the general in the same or another statute which otherwise might be controlling."); *VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574 (Fed. Cir. 1990). The same is true of treaty provisions. International law recognizes the principle of *lex specialis derogat legi generali*, that a more specific rule in a treaty prevails over a more general one. *See* International Law Commission, *Fragmentation of International Law: Difficulties Arising from the Diversification and Expansion of International Law*, Report of the Study Group, United Nations Doc. A/CN.4/L.682, (Apr. 13, 2006).

Applying these interpretive principles, Article XXI(3) rather than Article IV(6) is the appropriate treaty provision under which SSCF may seek refuge from U.S. taxes. The fact that the Tax Treaty contains a provision applicable only to income generated by tax-exempt organizations participating in pooled-investment funds reflects that this provision is the sole recourse through which the types of organizations covered by Article XXI(3) may obtain tax-favored treatment. The Tax Treaty's text and structure also support the conclusion that Article XXI(3), rather than Article IV(6), is the sole provision that governs an exempt organization's investment through a pooled-investment vehicle to receive tax-favored treatment.

To begin, both Articles IV(6) and XXI(3) were adopted together in the Fifth Protocol, and their simultaneous adoption indicates that they were intended to address different investment arrangements rather than create overlapping paths to the same exemption. Having been adopted together, Articles IV(6) and XXI(3) must be read *in pari materia*. Under this canon, courts interpret statutes and treaties with similar language that generally address the same subject matter together, "'as if they were one law.'" *Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972) (quoting *United States v. Freeman*, 44 U.S. (3 How.) 556, 564 (1845)); *see also Cannon v. United States Dep't of Justice*, 973 F.2d 1190, 1193 (5th Cir. 1992) (applying the canon of *in pari materia* to determine the meaning of two articles in the United States-Mexico Treaty on the Execution of Penal Sentences).

Article XXI(3) expanded an existing exemption for dividends and interest earned by qualifying pension, retirement, and employee-benefit plans, as well as qualifying entities that earned income exclusively for the benefit of these enumerated plans. Article XXI(3) was expanded to allow other tax-exempt organizations, specifically charities, to benefit from the same type of investments in pooled investment formats. Critically, even as the reach of the provision was being broadened to cover charities, the signatories preserved strict conditions for income earned by tax-exempt organizations in Article XXI(3) through pooled investments to remain exempt: the pooled-investment vehicle had to be generally exempt from income tax in its country of residence and could serve only qualifying tax-exempt organizations.

While Article XXI(3) addresses and expands the ability of tax-exempt organizations to invest through pooled-investment vehicles, Article IV(6) addresses any investor's entitlement to treaty benefits when the investor is treated under the tax law of its residence state as deriving income through a fiscally transparent entity.

Permitting SSCF to invoke Article IV(6) merely because the Greystone Fund distributes income or can deduct its distributions would bypass the conditions the signatories specifically negotiated in Article XXI(3). If a pooled-investment fund's ability to distribute income and reduce its entity-level tax had been sufficient to make it fiscally transparent under Article IV(6), then there would have been no need for a separate provision specific to tax-exempt organizations, like Article XXI(3).

The presence of Article XXI(3) in the Tax Treaty is itself evidence of the signatories' intent. They created a specific exemption for investment trusts, companies, and similar pooled arrangements serving charities and pension-related organizations because those arrangements were not necessarily fiscally transparent under Article IV(6). And under Article XXI(3) such entities do not have to be fiscally transparent. Is the converse true? Can a tax-exempt entity like SSCF obtain tax-favored treatment under the Tax Treaty through an investment in a pooled-investment vehicle that qualifies under Article IV(6)? Reading the two articles together, the answer is no. By imposing specific restrictions on the types of pooled-investment vehicles that qualify under Article XXI(3) requirements, the signatories intentionally limited the availability of tax-advantaged pooled-investment treatment to funds that serve exclusively charitable or other qualifying tax-exempt organizations. Allowing charities to sidestep this restriction under Article IV(6) renders the limitation of Article XXI(6) nugatory. Permitting SSCF to invoke Article IV(6) would effectively read out the signatories' limitations on pooled investments expressly imposed in Article XXI(3). It would also risk reading out Article XXI entirely by allowing any charitable organization to derive income through any form of investment vehicle so long as it was fiscally transparent. Accordingly, Article IV(6) does not apply to income derived by charitable organizations through pooled investments.

There is no dispute that SSCF invested through the Greystone Fund, a pooled-investment vehicle, and there is no dispute that the Greystone Fund does not satisfy the express requirements established by Article XXI(3) for charitable organizations to retain treaty-based tax-exempt treatment. Because under the Tax Treaty, SSCF can only obtain tax-favored treatment through the means established in Article XXI(3), the Tax Treaty itself forecloses SSCF's claimed refund.

### C. Extrinsic Evidence

Even if the provisions of the Tax Treaty relevant to the resolution of SSCF's refund claim could be read to be in tension with each other, the conclusion rejecting SSCF's claim would be identical because the extrinsic evidence of the Tax Treaty's purpose and the intent of the signatories further supports the conclusion that Article IV(6) is inapplicable to SSCF's U.S.-source dividend income arising from a pooled investment.

The potential that the two relevant provisions may be read harmoniously or may be in tension reflects a degree of ambiguity over the relationship between the two provisions and their application to SSCF. Accordingly, it is appropriate to consider extrinsic evidence of the Tax Treaty's purpose and the intent of the signatories in construing and applying the two provisions to SSCF. Of central relevance to this inquiry is "the negotiation and drafting history of the treaty as well as the postratification understanding of signatory nations." *GE Energy Power*, 590 U.S. at 441 (cleaned up).

The Technical Explanation provides guidance going directly to the interplay of the two provisions and how they may relate to each other and to this case. With respect to Article IV(6), the Technical Explanation addresses directly which types of specific entities are considered fiscally transparent under that article. For Article XXI(3), the Technical Explanation identifies the purpose for its adoption and outlines the types of entities to which it applies. Applying the Technical Explanation, SSCF is the type of tax-exempt charitable organization that Article XXI(3) was specifically designed to cover when it sought to invest indirectly through a pooled-investment fund, while the Greystone Fund is not fiscally transparent under Article IV(6).

The analysis must start with Article XXI(3), the treaty provision that is specific to SSCF and on its face provides how tax-exempt organizations may benefit from pooled-investment vehicles under the Tax Treaty. This article allows a tax-exempt organization to avoid taxation on income derived through a trust, company, organization, or other arrangement so long as that entity is itself exempt from income taxation and operated solely to earn income for tax-exempt organizations. (ECF 19-3 at 22-23.)

The Technical Explanation elucidates the purpose for which Article XXI(3) was negotiated and adopted. The provision was designed to solve a gap in the previous version of the Tax Treaty. Prior to the adoption of the Fifth Protocol, only pension, retirement, and employee-benefit arrangements could utilize a pooled-investment vehicle and qualify for tax-exempt benefits. A pooled fund holding investments for both qualifying pension arrangements and charitable organizations could not obtain the then-existing exemption.

Article XXI(3) was amended in 2007 specifically to allow charities like SSCF to take advantage of pooled-investment funds and avoid taxation and close the gap that had previously only allowed pension plans, among all other tax-exempt organizations, to take advantage of pooled investment options. The new provision contains a very specific limitation. Under Article XXI(3), the investment fund itself must be both exempt from income taxation in its residence state and operated exclusively to earn income for the benefit of qualifying tax-exempt organizations, now to include both pension plans and charities.

Thus, Article XXI(3) created an express exemption for qualifying pooled investment arrangements serving exempt organizations. SSCF had that option but instead chose to invest in the Greystone Fund, a unit trust that does not qualify under Article XXI(3). By its own terms, Article XXI(3) excludes from its coverage the Greystone Fund and, hence, SSCF's income derived from it.

This conclusion is bolstered by another document created shortly after the Fifth Protocol was negotiated, the Explanation of the Proposed Protocol prepared by the JCT. The JCT explanation to the Fifth Protocol independently mirrors the Technical Explanation's reading of both the meaning and the signatories' purpose in adopting Articles IV(6) and XXI(3). The JCT noted that Article IV(6) "provide[s] specific rules for the treatment of amounts of income, profit, or gain derived through or paid by fiscally transparent entities." (ECF 19-5 at 41-42.) The JCT relied on the Technical Explanation's proposition that the only Canadian entities that satisfy the definition of fiscally transparent are, absent a contrary rule of law, "partnerships and what are known as 'bare' trusts." (*Id*. at 42.)

Most relevant is the JCT explanation of the purpose of new Article XXI(3):

> Under the present treaty, certain types of exempt organizations (for example, pensions) may invest either directly or indirectly with other organizations of the same type, while other types of exempt organizations (for example, charities) are limited to direct investments. Thus, charitable type organizations–which are limited to direct investments–cannot participate in collective investment vehicles. This has the corresponding impact of prohibiting charitable-type organizations from pooling their investments with pensions that are investing indirectly through collective investment vehicles. New paragraph 3 eliminates this restriction by permitting charitable-type organizations to pool their investments with other exempt organizations. Thus, once the proposed protocol enters into force, charitable type organizations will be able to invest indirectly; this will have the corresponding impact of permitting them to pool their investments with pension-type organizations that are also investing indirectly.

(ECF 19-5 at 76.)

Like the Technical Explanation, the JCT explanation also considered Article XXI(3) as a targeted expansion of existing treaty benefits for tax-exempt organizations to allow charities to invest through pooled, intermediary arrangements. Article XXI(3) specifically addressed the gap adversely affecting charities in the prior version of the Tax Treaty. This understanding supports the conclusion that Article XXI(3) was adopted to broaden the ability of charities to benefit from pooled-investment vehicles. Having addressed the gap that limited charities' investment opportunities in the prior version of the Tax Treaty, it seems unlikely the signatories would then craft a separate provision applicable to charities without noting that fact.

Both the Technical Explanation and the JCT explanation are consistent and both support reading Article XXI(3) as the sole provision applicable to SSCF.

Article IV(6) instead provides a framework to determine when an item of income is derived by a resident of one contracting state through an entity that is "treated as fiscally transparent under the laws" of that contracting state. The provision serves the general purpose of establishing the rule by which the income earned by a resident of one of the signatory countries will be treated when the income is earned through a transparent entity. The Technical Explanation defines a transparent entity as one whose "income . . . is taxed at the beneficiary, member, or participant level." (ECF 19-8 at 4.) Thus, a transparent entity does not incur tax liability on its income but instead distributes its income to others, who themselves must account for the income and pay taxes on it. In establishing this general rule, Article IV(6), on its face, applies to all persons and entities who earn income through fiscally transparent entities and includes no reference to charitable and other tax-exempt organizations.

The Technical Explanation notes simply:

> New paragraphs 6 and 7 are added to Article IV to provide specific rules for the treatment of amounts of income, profit or gain derived through or paid by fiscally transparent entities such as partnerships and certain trusts.

(*Id.*)

The reference to "certain" trusts reflects that Article IV(6) does not treat every trust as fiscally transparent; rather, fiscal transparency depends on whether the entity's income is taxed to its interest holders instead of at the entity level. (*Id.* at 4-5.) Article IV(6) was specifically intended to establish a rule to determine when income derived through a fiscally transparent entity is treated as derived by the entity or by its interest holders. The Technical Explanation contrasts fiscally transparent entities with "[e]ntities that are subject to tax, but with respect to which tax may be relieved under an integrated system [and] are not considered fiscally transparent entities." (*Id.*)

In noting in its summary of Article IV(6) that "[f]iscally transparent entities, as explained more fully below, are in general entities the income of which is taxed at the beneficiary, member, or participant level," the Technical Explanation signals that the general definition is elaborated by the specific discussion that follows. The Technical Explanation goes on to delimit the types of entities that are fiscally transparent:

> Entities that are fiscally transparent for U.S. tax purposes *include* partnerships, common investment trusts under section 584, grantor trusts, and business entities such as a limited liability company ("LLC") that is treated as a partnership or is disregarded as an entity separate from its owner for U.S. tax purposes. Entities falling within this description in Canada *are* (except to the extent the law provides otherwise) partnerships and what are known as "bare" trusts.

(*Id.*) (emphasis added.)

The distinction between the coverage of U.S. and Canadian entities is significant. In describing qualifying U.S. entities, the Technical Explanation uses the word "include," and the list that follows is thereby illustrative and not exhaustive. By contrast, the Technical Explanation specifically delimits the Canadian entities that qualify as fiscally transparent by naming them with specificity. These qualifying Canadian entities "are (except to the extent the law provides otherwise) partnerships and what are known as 'bare' trusts." (*Id.*) The use of "are," rather than "include," reflects that the United States understood only very specific Canadian entities qualified as fiscally transparent, and by subscribing to the Technical Explanation, Canadian authorities concurred in this understanding. Read in context, the use of different verbs must be given meaning.

Under Article IV(6), as explicated by the Technical Explanation, Canadian unit trusts were not recognized by the signatories at the time the Fifth Protocol was negotiated and adopted as a fiscally transparent entity. The parties do not dispute that the Greystone Fund is a Canadian unit trust and is neither a partnership nor a bare trust. Based on the Technical Explanation's interpretation of Article IV(6), the signatories intended to exclude unit trusts from the ambit of Article IV(6) of the Tax Treaty.

The inclusion of the qualifying phrase "except to the extent the law provides otherwise" does not alter that conclusion. While this language preserves the possibility that Canadian law may treat an entity differently, it does not transform the limited list of qualifying Canadian entities that are fiscally transparent under Article IV(6), partnerships and bare trusts, into an open-ended category encompassing every type of Canadian trust, including a unit trust, which existed at the time the Fifth Protocol was negotiated and adopted. For an entity to qualify under this phrase, Canadian law must require the entity to pass through its income to its owners or beneficiaries; an obligation arising from a trust indenture or similar instrument is insufficient under the plain language of Article IV(6).

The text, structure, and amendment history of the relevant provisions of the Tax Treaty all point in one direction. The extrinsic evidence of the Technical Explanation and the JCT explanation point in the same direction. Considered either separately or together, the Tax Treaty, as amended by the Fifth Protocol, and the extrinsic evidence demonstrate that the signatories' intent was for charities to obtain the benefit of investing through pooled investments through the route specifically created for them in Article XXI(3). Having created and delimited that route, the signatories did not give charities the alternative option of investing through a Canadian unit trust and treating that vehicle as fiscally transparent under Article IV(6). The Technical Explanation is especially significant because it is an official U.S. guide to the Fifth Protocol and notes that the Canadian government reviewed and subscribed to its contents as accurately reflecting both governments' understandings concerning the Fifth Protocol.

The adoption of Articles IV(6) and XXI(3) within the same package of treaty amendments is significant. Read together, these two amendments reflect a deliberate allocation of treaty benefits. Article IV(6) addresses an investor's entitlement to treaty benefits where the investor is treated under the tax law of its residence state as deriving income through a genuinely fiscally transparent entity – e.g., a partnership or, in Canada, a bare trust. Article XXI(3), by contrast, addresses exempt organizations' investments through a separate trust, company,

organization, or other arrangement that is itself generally exempt from income tax and is operated exclusively for qualifying exempt beneficiaries.

The signatories expanded the ability of charities to earn tax-favored income through pooled-investment funds under Article XXI(3), subject to that provision's particular requirements. They did not correspondingly expand Article IV(6)'s definition of fiscally transparent Canadian entities. In fact, unlike the inclusive list for U.S. entities, the signatories limited Canadian entities that qualified as fiscally transparent under Article IV(6) to partnerships and bare trusts.

In the context of their joint adoption, Articles XXI(3) and IV(6) may be read in harmony with each other. Article XXI(3) expanded pooled investment opportunities for charities. To benefit from this change, though, charities had to invest in conformity with Article XXI(3). Article IV(6) is a rule of general application but does not apply to the pooled investments of charities. The signatories had no reason to exclude charities from the coverage of Article IV(6) because they elsewhere, in Article XXI(3), addressed their needs separately and specifically.

There are two fundamental flaws in SSCF's argument. First, if the Tax Treaty allowed charities to invest in any type of Canadian pooled fund that met Article IV(6)'s definition of fiscal transparency and avoid taxation in the country where the income was earned, the signatories would not have had to include the new investment vehicle allowed in Article XXI(3). Article IV(6) would have already addressed the problem the signatories had identified in the prior version of the Tax Treaty, the inability of charities to invest indirectly through pooled-investment vehicles. Second, the ability of charities to avail themselves of investments covered by Article IV(6) would obliterate the specific limits on qualifying pooled-investment vehicles set out in Article XXI(3). There, the signatories limited charities to investments in pooled-investment vehicles that are open only to tax-exempt organizations to obtain tax-favored treatment. It is inconceivable that the drafters of the Fifth Protocol would have set this restriction in Article XXI(3) only to open wide an exception to that restriction through Article IV(6). Even if Article IV(6) were applicable, the Technical Explanation supports the conclusion that unit trusts are not considered fiscally transparent under that provision, so it cannot salvage SSCF's claim.

Article XXI(3) is the provision the signatories designed to govern an exempt organization's investment through a pooled vehicle. SSCF may not obtain tax-favored treatment by investing in a vehicle that does not comply with the restrictions in Article XXI(3). SSCF may not obtain tax-favored treatment by investing in a vehicle that may comply with Article IV(6). Accordingly, the defendant is entitled to summary judgment, and SSCF's motion must be denied.

## VIII. CONCLUSION

Together, the Tax Treaty text and the relevant extrinsic evidence reflect a deliberate allocation of treaty benefits: the signatories expanded Article XXI(3) to allow charitable organizations to benefit from investing in pooled-investment vehicles, but only when the vehicle is restricted to tax-exempt organizations. Allowing charities to benefit from Article IV(6) and evade that restriction is inconsistent with Article XXI(3). At the same time, the signatories adopted Article IV(6) but expressly limited its application in Canada to partnerships and bare

trusts. SSCF cannot rely on Article IV(6) to avoid U.S. taxation of its U.S.-source dividend income. Rather, Article XXI(3) governs the treatment of SSCF's U.S.-source income through the Greystone Fund. Because the Greystone Fund is not limited to tax-exempt organizations, its income does not qualify for the favorable tax treatment in Article XXI(1).

Accordingly, the defendant's motion for summary judgment (ECF 20) is granted, and the plaintiff's motion for summary judgment is denied (ECF 19). A separate order reflecting this determination will be entered concurrently with this opinion.

s/ Richard A. Hertling

**Richard A. Hertling**
**Judge**